Calling case numbers 15-5698, 15-5699, and 15-5711, Bank of America, NA et al. v. Corporex Realty and Investment et al. Oral argument not to exceed 15 minutes per side. John Nalbandian for the appellants. Your Honors, this simple foreclosure case is actually anything but simple. It is marked by Bank of America's systematic efforts to force the loans at issue into default, thereby avoiding the borrower's rights of first refusal. Those unique rights of first refusal were contrary to the bank's policy and made it difficult or impossible for the bank, under pressure to downsize its loan portfolio, to sell those loans. The bank hadn't agreed to those rights of first refusal. In fact, it had inherited them when it bought LaSalle Bank and in turn inherited those loans. The bank knew, and all this is based on evidence directly from the bank, that getting the loans into default would avoid those rights of first refusal. And those loans were currently performing, even in the deepest part of the Great Recession. And again, this case traces back to the 09-10 time period, and I think that's a very important thing to keep in mind. So the bank dragged out loan modification and extension negotiations, told Corporex to forego financing opportunities, while at the same time plotting internally to get out of the relationship because the credit exposure in their minds was unacceptable at any level. Now, during this time, the bank induced the pre-negotiation letters that are the focus point of our appeal. Having coaxed defaults and gotten the pre-negotiation letters signed, the bank eventually offered those loans for sale. How does it fit in your analysis that the Madison Place loan has never been sold? Am I incorrect on that? It was placed in the Project Atlas. Yes, it was offered for sale and never actually sold. But it was not sold. That's true. Nor did Corporex itself buy the loan. That's true. So we don't have, for example, the breach of contract claim on the right of first refusal. So the right of first refusal is in the loan document. The Olympic Building has a breach of contract claim for the breach of the right of first refusal. Madison does not, the district court found, because the loan was not sold. However, the district court also found that the right of first refusal with regard to Madison was linked and was part of the good faith and fair dealing claim that Madison was making. So it's part of the case in that sense for Madison. But in terms of the breach of contract, only Olympic has the breach of the loan document for the right of first refusal. I guess I'm trying to kind of understand the concept, because your argument is hinged on the idea that they wanted to get rid of the loan, so they wanted to place all three of the loans into a discounting package because they knew they could sell them in the discounting package. But, in fact, they didn't. So I'm asking you how that impacts your understanding. They were not able to. They were able to put the loans, they were able to sell them eventually because they didn't have the rights of first refusal. I mean, by the time they offered them for sale, of course, they had declared them to be in default, which was the plan all along. Get them into default, there is no right of first refusal, so then they don't have to offer them to Corporex for sale. Now, eventually, Corporex does settle with the buyer of the two loans, but Madison is never sold. So if the idea was that you wanted to purchase those loans back as if it were a right of first refusal, then the opportunity has and remains there for the Madison loan. Is that correct? So could you not buy the Madison loan? The right of first refusal didn't kick in. I'm beyond that. I'm trying to understand. If it's a right of first refusal, then your argument is we wanted to buy the loans and not let you package them to someone else. That's what we want. And so I'm trying to understand how it fits within that argument that you have had the availability to, in fact, buy one of those loans and have not done so. Well, their position is that they've never determined to sell the loan, so the right of first refusal, well, it's in default, so obviously their position would be it's not relevant at all because it's in default. But their position is also they never determined to sell it. They never determined to sell the Madison loan. Before it went into default, but I'm asking you the after question. It's in Project Atlas portfolio. Right. So available for purchase, correct?  Oh, I'm sorry, in June and August of 2011. Yeah, July of 2011. Yeah, I'm not sure, Your Honor. Could we have, I guess I'm not understanding the question. Could we have been on the loan at that point? No, could you have? If your goal was to purchase the loans yourself through a right of first refusal, why didn't you purchase the Madison Place loan when it was placed into an available portfolio? I'm not sure, Your Honor. Okay. I'm not sure. I think Judge Strange's question is does that not undermine your argument that you never did capitalize on its availability? I don't know. I guess I don't know the details. Okay, maybe we'll scoot back to the beginning here and you give your argument that you wanted to bring to us. Okay. The plan, at least for me at least, was to start with the project. The whole argument hinges on this idea that this was a lowdown scheme by Bank of America to make sure that you didn't get these loans. Right. And for that, you must have some evidence of the idea that Bank of America determined to circle around you prior to the Olympic default. Right. Okay, so make that point. What evidence is there of that conspiracy kind of scheme? Okay, let me go back and talk about, because I think this is all linked to certain determinations by the trial court. The trial court determined that the pre-negotiation letters barred all of our claims. Yes. And our argument is... Do you want to argue with that one? Because that's the next one. Well, it is. I think it's all linked together. What's your best argument about that? About the... About those pre-negotiation letters. Pre-negotiation letters were fraudulent. You're closing the arguments you have here today. Well, there are a couple of arguments that we've made, and I can talk about them. But fraudulent inducement is our main argument, that the letters were fraudulently induced by the bank during this entire scheme by the bank. Now, the best piece of evidence, the evidence that we talk about, is the determination by the bank in November to change the credit exposure of CorporEx from decrease to out, meaning credit exposure at any level is unacceptable. At the same time that they internally say, we want to get out of this relationship with CorporEx, they come to us and say, no, we want you to sign this pre-negotiation letter because we're negotiating with you about the loans. Okay, sir. Was there not some prompting on your end that said, please, we want to buy these loans? They were making this deal because there was some request by CorporEx. CorporEx wanted to maintain the loans and wanted to keep performing on the loans, had been performing on the loans. Hoped to, but was having trouble. And, again, there were some debt service coverage covenants in the loans that they thought were going to be problematic. But, again, they're currently performing. They're making all the payments. You're talking about CorporEx. I'm having trouble with your pronouns. So, they is whom? CorporEx. Right. CorporEx is performing on the loans but realized that at some point they were going to have a problem with the coverage covenants in the loans. So, CorporEx goes to Bank of America and says, we would like to work with you moving forward and get an extension and modification of the loan documents. Nothing extensive. The bank says to us, okay, we can work around those coverage issues. We'll work with you. We can get you extensions. Those are the kinds of signals that we were getting. Make us a proposal, the bank says, and we make them a proposal. In the meantime, the bank internally is saying, well, hey, one email, I don't think this is really a counterproposal that they're going to take. This is more of an attempt to show that we're thinking about the issue before we transfer the loans to work out. You know, another. There's no question that it feels like you weren't dealt with squarely. There are emails going on in the background and there's kind of assurances going on to you. Right. That makes you feel like you didn't get the full scoop. Absolutely. No question. My question to you, though, is what makes that rise to the level of clear and convincing evidence of bad faith rather than somebody who has the power and exercises it? I think it's beyond that, Your Honor. I do. I think that when you have, and this case, I think, is marked by direct evidence, internal evidence. What's the very best evidence you have? You don't have to be nice. I agree. The business world says if I have the power, I can exert it. But I think the out memo, I think when they specifically say, we want out of this relationship, credit exposure is unacceptable at any level. In the meantime, they had told us, they had sent us a letter saying, you need to pay $4.5 million to keep the Madison loan current. And then they say, well, it's a matter of procedure. We'll make a proposal to you. And then immediately we start negotiating the number is $3 million, not $4.5. So they're saying to counsel, one of us talks at a time. Let's get that agreed. I'm looking to you to tell us where's the evidence of unlawfulness. Where is this unlawful? Judge Stranz puts it as power and exercise. What do you say about that? I mean, it's fraud to make a promise and not have any intention of keeping it. I mean, they are leading us to believe that they are going to enter into modifications and extensions of these loans. But the evidence from the bank is showing us they have no intention of doing that. They don't want to negotiate an extension or modification. They want out of the relationship. Okay, well, we have your argument then. Time's up, and we'll hear from you on rebuttal. Let's hear what your opponent says, and then we can better answer it. Good morning, Your Honors, and may it please the Court. My name is John Hacker, counsel for the Affiliate Bank of America. As the conversation thus far has indicated, the case involves many issues. The district court's thoughtful summary judgment opinion gets all of them correct. And this court could easily, I think, simply summarily affirm. But it could also agree with just a few, more explicitly, with just a few key issues that I think suffice to resolve every claim. And let me start with where I think Judge Stranz started, which is with the Madison loan. The judgment of foreclosure and the money judgment on the Madison loan has to be affirmed, no matter what anybody thinks about any other issue in this case, because there isn't any dispute that they owe the full amount that's owed on the Madison loan. There's a judgment for the amount of the Madison loan, and they've got no argument against enforcement of that judgment. What they say in their reply brief, I think, is telling. What they say in their reply brief at page 14 is they concede that they do not seek to excuse themselves from paying the balance of the Madison loan. That's their position in their reply brief. What they say in their reply brief is that they only want to offset what they conceitedly owe on the Madison loan with whatever damages they might eventually get on the Madison good-faith claim. And so they don't have any argument in their reply brief about actually paying the Madison loan as such. It's just this argument for offsetting eventual damages. I understand. You have to pay me for what you owe me. I have to pay you for what I owe you. So the real question in the case is, does Bank of America owe them anything? Because their claim is Bank of America does. I agree with half of that, which is that it's not actually – it doesn't affect the enforcement of the Madison judgment as such, because under federal procedural law, the court can bifurcate and treat those separately and enforce the judgment and then take however long it takes to prosecute the good-faith claim. And that can happen whenever it happens. So the judgment has to be – So put that aside. You've won that. Let's assume for argument. I understand. Then what is your argument as to why none of their counterclaims hold water? I think it's important to distinguish the counterclaim for good-faith on the Madison loan from the counterclaims both for good-faith and promissory estoppel on the Olympic loan. There's only a promissory estoppel on the Olympic loan claim, which is based on this idea that we promised to negotiate in good-faith and therefore went alternative financing. There is evidence of that, right? The discovery has shown that there were e-mails saying one thing and the negotiations suggest another. Evidence of what? What there's evidence of is that we promised to enter negotiations. There is also evidence that they say in reliance on that promise at the time that they forewent an opportunity for other financing on the Olympic loan. There's a myriad of problems with that, but let me put that to one side for a moment because I want to stick with the Madison loan where they don't have that argument. On the Madison loan, nobody disputes this. They never said we're going to forego refinancing on the Madison loan, so let's do discussions. On the Madison loan, the only thing that ever happened was foreclosure. We think Madison's an outlier perhaps, so should we not argue about Olympic, etc.? Tell us your Olympic argument because that's where they say you strung us along and when we thought we had terms, we said, okay, send us the document that reflects these terms, and you sent them a completely different document. It had waiver of jury trial and other provisions that any business entity would or individual would consider onerous. There's much to say about that, and so we're putting Madison to one side because it's a very different argument there. I don't even understand the good faith argument on Madison. On Olympic, I'll start with a proposition that, well, I'll start with this, that in those statements, in the term sheets themselves, without exception, every term sheet says this is not a binding agreement. It is subject to final terms and all of that. All of them by the terms. Every time we make an offer, it is said not to be. The issue is you are holding out to someone an offer of terms. I understand that you reserved some right in there to add other terms, but you're trying to agree on the basic core terms. But then the document that comes to them includes some core terms that are pretty onerous that are never mentioned in the term sheets. Why is that not evidence of lack of good faith? The first proposition is there's no reliance because of the observation, the statement, that this is not binding, this is not. But more importantly, the pre-negotiation letters prohibit them from standing up in a court after the fact and complaining about anything that we say in the course of the negotiations. That is the sole and exclusive purpose of a pre-negotiation letter. Maybe we should talk about the pre-negotiation letters because these pre-negotiation letters, the question is, how were those negotiated and was valid consideration given for that? You agree, you say in there that Bank of America's agreement is not to pursue foreclosure during negotiations. Then that's your consideration. And yet the forbearance agreement... Council wants to tweak that a bit. No, no, please finish. Okay, yeah, let me... Please finish. Tweak, let me finish. Yeah, yeah, absolutely. But then the agreement, on the other hand, says that you can cease negotiations and seek foreclosure immediately at any time. So how have you given valid consideration for the pre-negotiation letter? Because our primary consideration is something else, and that is the mutual exchange of releases for any claim that may arise in the future coming out of these negotiations. Both sides exchange that consideration, which is to say, if you make a misstatement to me, if you lie to me, if you act in bad faith, I am not going to sue you for that. And we know what happened. They have said in their reply brief, in both of their briefs, that they lied to us in the course of negotiations over the debt service covenant with respect to the Madison loan. Remember, they said in negotiations, all we have is, this is in writing, all we have is $3 million. We cannot obtain more than $3 million. And we relied on that and didn't enforce the debt covenant violation at that, the debt covenant cure at that time, at that point, which is actually $4.5 million. And now they tell us that was a lie, and that they actually could have paid $4.5 million. We can't sue on that misrepresentation and our reliance on it because the pre-negotiation letters benefited both parties by prohibiting that kind of claim. What you can't do, say the pre-negotiation letters, without ambiguity, is sue based on something that is said during this back and forth so that we have the space to be aggressive, hard-nosed negotiators and do whatever we need to do to reach a modification, which by the way, remember, the documents themselves say that they can only be modified in writing. So we can't talk about, even by the terms of the documents, we can't talk about an implied modification because we said we would talk about a three-year extension or whatever it is. That can't be written into the document. But then the pre-negotiation letters say, you can't bring a good faith claim, you can't bring a promissory estoppel claim based on some statement we made during the course of the negotiation. And that's what the primary consideration is. It is a mutual consideration. How does this release then fit in the context of a fraud? Their allegation is that there is clear and convincing evidence of fraud. And so your position would be, but we got you to sign the pre-negotiation letter so you've waived your fraud claims? Sort of. There isn't clear and convincing evidence of fraud. What they say is fraud, is that we said we'll have discussions. I'm going to keep it generic. I understand that we may think it didn't rise to that level. I'm asking you conceptually. Your argument is, before we will enter negotiations with you, you're going to sign a release that will release you and us for anything that we do in these negotiations. Fair, unfair, legal, illegal. Based on statements. So if the fraud is based on a statement that we will negotiate in good faith, we'll get to a modification, we'll be able to work that out. If it's based on a statement, the whole point of the pre-negotiation letter is to nullify a claim based on the statement. Of course, if we put a gun to their head, literally, or threatened their children or something and said you have to do this, that's not a statement. That's a criminal act. It's a different kind of act that wouldn't be precluded, I think, in a subsequent tort claim. But when you make a statement in the course of negotiations, including a statement prior to the pre-negotiation letter that says we'll enter negotiations in good faith, but you need to sign this pre-negotiation letter, and that pre-negotiation letter says explicitly, and let me emphasize, they wrote the pre-negotiation letter. This wasn't the bank's letter that we made them sign. This was the letter that they wanted to sign. That pre-negotiation letter says neither party can rely on any statement during negotiations or before negotiations about the loan, any loan communication. And that's what that statement obviously would be, a statement that we will discuss in good faith modifications, is explicitly, the pre-negotiation letters, explicitly prohibit either party from making a claim, whether it's fraud or anything else, any kind of claim based on that statement, because what the pre-negotiation letter says, explicitly, their letter says that those statements aren't binding on either party. And that's why it applies to the claims that are made. Simply put, you had the legal power to do what you did, is the basis of your claim. Well, the contract, the parties agree that both parties had the power. Right, right. Both parties did. Remember, this is not, you know, a mafia shyster dealing with a laundry, struggling to make a payment. We're talking about, you know, hundreds of millions of capital, well-capitalized commercial real estate developer who got a loan and doesn't want to pay it back. That's all that's going on here. There's nothing complicated about this. With respect to return, if I can... Their response would be, we want to pay it back, we just can't do it quite on the old terms. Won't you work with us to create new terms? And the question is whether you had to or not. And your position is that under the documents that were executed in this case, you didn't have to. But if I can return to the Madison loan then, because remember, the Olympic loan is gone. That's not even in the case. Nobody's talking about enforcement of the Olympic loan other than the right of first refusal, which is a separate, you know, damages issue, and we can talk about that. But the Madison, they just don't want to pay the Madison loan. And they've got no claim about the Madison loan that would justify their not paying the Madison loan. Now, remember, they don't have the promissory estoppel claim. They didn't try to, they didn't forego refinancing. All their claim with respect to good faith on the Madison loan is that it's very explicit that we breached the good faith covenant not by just stringing them along, because that didn't, it wouldn't matter if we were stringing them along. Remember the loan became due in October of 2011. It's just due. It doesn't matter if we strung them along for two months or three months during the course of the loan. The loan is still due. So stringing them along has nothing to do. It matters when it goes into default, because that vitiated their right of first refusal. Not on the Madison loan, because the Madison loan, right, It's only the contractual loan for the Olympic. Yeah. I'm talking about the Madison loan. There's no story they can tell that says anything that we did prevented them in any way from paying the loan in October 2011 when it became due. There's no story there. So what is your best argument on the proof issues regarding the other loans that have to do with the claim of bad faith? Your claim of the statements, the email statements, that those, what is your response? So there's a lot. I mean, we already talked about the primary response, I think, which is the pre-negotiation letters preclude them from complaining about anything that we said. The other point, I think, is it's perfectly clear that there is no reasonable reliance on whatever statements were made because of not only the pre-negotiation letters, but because the communications all said nothing we're saying is binding here. And finally, there's no evidence of any misrepresentation of our intent to negotiate. Again, you heard this morning, that's the story, that we had devised this scheme to sell the loans and this was all cover to get there. The two points on that I would make are first, it's really only based on the out designation, as opposed to decrease in that email. The definition of out in the email that they rely on, the definition of out contemplates new loans with the same lender. It never says sale, it just says they're not going to do new business unless it's a way of reaching a complete payout on the existing loan. The whole point of out is no new business, no new loans, let's get out, let's work out this loan. It doesn't say sale, that's not anywhere in it. And... What are the important distinctions between your case and the Tampa case that Judge Merriday decided and found it was not subject to summary judgment determination? Well, with respect to the Madison loan, there is a difference. There's not an offer of refinancing. Again, I can't emphasize that enough. And beyond that, it's a similar record. I think the problem with Judge Merriday's decision is just incorrect. That's the fundamental problem is that on each of the relevant points. But I can make another point about the evidence of the alleged misrepresentation that we didn't want to negotiate in good faith because we wanted to sell. We had a right to sell by the terms of the agreement when the loans went into default in February. They were declared a default. So on their theory, of course, what we did then was immediately sell them, right? That's not what happened. We negotiated for four months. Continued to go back and forth and back and forth, continuing to negotiate. There's no reason by their own theory as to why we would continue to negotiate rather than shut it down as soon as they go into foreclosure, as soon as they go into default, and then make that sale that was our plan all along. I would add to that, a third related point is the email they rely on that says out by its own terms refutes the idea that sale was the option. But there's no evidence anywhere that sale in those months of internal emails, nobody ever says the word sale. You don't see the word saying, here's what we're going to sell to, here's what we want to sell to, we don't want to deal with these guys ever more, we need to sale. So there's no evidence on that point, but the more fundamental point I think is there's no defense to enforce in the Madison judgment and the P&Ls resolve every other extra contractual claim in the case. Thank you very much. Thank you. Any arguments? Okay, counsel. Just to address your question, Judge Strange, the earlier question, the bank never told us that they had offered the Atlas, the Madison loan for sale in the Atlas portfolio. So my understanding is we didn't know that and there's testimony that says... We're not paying on the Madison loan at that time. But we can't buy it if we don't know it's for sale. I mean, is that... We're talking about the June of 2011. You're saying, why didn't you buy the loan when it was offered for sale as part of the Atlas portfolio? We didn't know, we didn't learn that until after the case had been filed. And the other thing is... Was there a reason even after the case had been filed? My understanding is that we did have discussions with the bank about purchasing the loan. I mean, I don't want to get into settlement discussions and things like that, but that's my understanding. In addition, there's testimony that we cited in our reply brief that indicated that the bank customarily did not sell loans to borrowers. So, that was their policy not to do it. So, I don't know that they even would have told us that. To sell back to the borrower. Faulting borrowers, I'm asking if that's what you're talking about. Yeah, that's my understanding. Well, the right of... Borrowers who did not pay as agreed. Well, no, to any borrower. The right of first refusal that was in this loan, in these three loans, is not something that Bank of America did customarily. It was something that we had negotiated, obviously, with LaSalle Bank, the predecessor, and so that was... The pre-negotiation letter that was, Council tells us, drafted by your side. Yes? No? Do you disagree? No, there's conflicting testimony about that. What's the right answer? Tell us. Who drafted it? I don't know. Mr. Butler testified that it wasn't, and Ms. Andren testified that it was from Corporex. I thought Bank of America had made an offer of some sort of pre-negotiation agreement and that you countered with the agreement that was actually signed. Is that incorrect? I don't know. There's conflicting testimony about... You mean where the actual words came from? Mm-hmm. There's conflicting testimony about that. And your client denies drafting it? My client testified that he didn't draft it. Mr. Butler testified... I don't have the testimony, but regardless, nobody is claiming that it should be construed against the drafter or that it has any legal consequence who drafted it, as far as I know. So I don't think it's consequential. You probably had a point you wanted to make. Well, I just wanted to talk just for a second about the Madison loan. I mean, we do have a good faith and fair dealing defense on the default of the Madison loan. And while we are not denied that we would owe something on a Madison loan, one of the main questions would be when that default happened. Right now, the judgment is default November of 2010. Our argument is, no, we would have, could have paid the $4.5 million, which would have put that default off. But so that... So the amount of the judgment would change depending on what we were able to prove we could have done in the interim between November 2010 and October of 2011, which is when the maturity would have come up. And so there... You're taking lots more of your time. You want to wrap up? Unless the court has any other questions, we would, you know, we think that Judge Mary Day's opinion was well done and we would ask for a trial. Thank you. All right, gentlemen, we have your matter. We will consider it carefully and issue an opinion in due course. Thank you.